# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 22, 2015

## STATE OF TENNESSEE v. RODERICK DEWAYNE CROSBY

**Appeal from the Criminal Court for Davidson County**
**No. 2011B1911      Mark J. Fishburn, Judge**

---

### No. M2014-00914-CCA-R3-CD – Filed July 13, 2015

---

The defendant, Roderick Dewayne Crosby, was convicted of four counts of aggravated kidnapping, Class B felonies, three counts of aggravated robbery, Class B felonies, one count of burglary, a Class C felony, one count of aggravated assault, a Class C felony, and one count of possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony. The trial court imposed an effective sentence of thirty-four years. On appeal, the defendant contends that the evidence is insufficient to support his convictions for aggravated kidnapping; the trial court erred in denying his motion to suppress a photographic lineup identification; and that the trial court erroneously applied an enhancement factor and erred by imposing consecutive sentencing. After reviewing the briefs, the record, and the applicable law, we affirm the judgments of the trial court but remand the case for resentencing for the firearm offense and for the entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

JOHN EVERETT WILLIAMS, J. delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ. joined.

Joshua L. Brand (on appeal), and Mark Kovach (at trial), Nashville, Tennessee, for the Appellant, Roderick Dewayne Crosby.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sarah Davis and Robert McGuire, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

This case arose after the defendant and two others invaded the victims' home. T.B.[1] testified that at the time of the incident, she was living with her grandmother, B.M., her mother, P.M., and her younger brother, J.C. B.M. slept on a couch in the living room, J.C. had his own bedroom, and T.B. and P.M. shared a bedroom ("T.B.'s room"). On the evening of the incident, after the rest of the family had gone to sleep, T.B. was awake in her bedroom when she heard several loud kicking noises at the door. She started screaming at her mother that someone was kicking the door, and the two rushed into the living room.

T.B. and P.M. saw three men in the living room. All three men were wearing dark "hoodies," had bandanas covering their faces, and were holding guns, which the victims testified were visible for the entirety of the incident. T.B. testified that the victims' cell phones were all on a dresser and that the men took the cell phones as soon as they entered the residence. The first man was later identified as Kirk Pointer, the second man was identified as the defendant, and the third man was identified as "Pop."[2] T.B. described the defendant as an African-American male who was "kind of short" with "shoulder length" dreadlocks. She believed that the defendant's hood was down because she was able to see his dreadlocks. She testified that the defendant had his sleeves rolled up, and she saw that he had a sizeable tattoo of the letter "C" on his left arm. He wore a bandana tied around his mouth and nose, but the bandana slid off of his nose several times, allowing T.B. to partially see his nose. T.B. recognized him as a person whom she had previously seen at a store in North Nashville, but she did not know him by name. P.M. described the defendant as an African-American male who had dreadlocks that fell just beyond his shoulders. She also testified that his sleeves were rolled up and that he had a "very visible" tattoo of the letter "C" on his left arm. P.M. saw that the defendant had other tattoos, but she did not attempt to identify them because the "C" was the most distinguishable tattoo. T.B. and P.M. both identified a photograph of a tattoo of a "C" as the tattoo that they saw on the defendant.

T.B. believed that the men were intending to rob her sister's boyfriend, whom they mistakenly believed lived at the residence. She testified that the defendant, after seeing a picture of her sister's boyfriend, informed Mr. Pointer and Pop that they were "in the right house," although J.C. testified that it may have been Pop who identified the

---

[1] In order to protect the privacy of the victims, we will refer to them by their initials.

[2] From the testimony at trial, it is unclear whether the third man's name was "Pop" or "Pac." The majority of the witnesses referred to "Pop," and we will do the same throughout the opinion.

boyfriend. The men asked if anyone else was in the house, and P.M. informed them that J.C. was there.

J.C. testified that he was in his bedroom asleep when he heard shouting in the living room. He went to investigate the commotion and saw T.B., P.M., and B.M. in the living room with three armed men. J.C. attempted to return to his bedroom, and the defendant followed him into the room. J.C. described the defendant as an African-American male who was 5'8" or 5'9" tall with dreadlocks "past his shoulders." At one point, the defendant grabbed J.C.'s arm and ordered him to go into T.B.'s bedroom. J.C. was able to look at the defendant's arm, and he saw a large, green letter "C" tattooed on the defendant's left arm. He saw that the defendant had other tattoos, but he could not identify them. He testified that the defendant wore a blue bandana tied around his face that fell down several times, allowing J.C. to see the defendant's face from the top of his lip to his eyes at times during the incident. J.C. testified that he was attempting to pay close attention to the defendant's face "[t]o see if I could see who he was or could I remember who he was."

The men took all of the victims into T.B.'s bedroom and ordered T.B., P.M., and J.C. to lie on their stomachs on the bed and to place their hands behind their backs. Mr. Pointer then put duct tape on their hands, ankles, and mouths. B.M. was in the bedroom, but the men did not duct tape her. As Mr. Pointer was binding the victims, the defendant and Pop started to ask the victims where the money was, with the defendant stating, "[W]here is the money; ya'll know where the money is." T.B. testified that while the defendant was demanding the money, Pop "was just standing around just watching everything" and that he appeared to be using a phone or a walkie-talkie to narrate the unfolding events to someone outside of the residence. All of the victims testified that the defendant was in close proximity to them while they were in the bedroom and that he was holding his gun.

Shortly after duct taping the victims, the men began ransacking the house. T.B. testified that the men were "going through everything, pulling everything out." P.M. testified that the defendant was "[u]sing a lot of profanity, asking us where the money [was] and mostly he was just tearing up the house." The defendant found P.M.'s purse, and she saw him empty the contents onto the floor. P.M. testified that $400 and a cell phone were taken from her. Each of the victims testified the defendant was primarily responsible for the search of the house.

While the defendant was scouring the residence, Mr. Pointer took P.M. into J.C.'s bedroom. He removed the tape from her mouth and started to kiss her. He pulled off her pajamas and kissed her breasts. He then took down his pants and demanded that P.M. perform oral sex on him. When she was finished, Mr. Pointer told her that "he was going

3

to do [her] daughter the same way" if P.M. did not tell him where the money was. Mr. Pointer returned P.M. to T.B.'s room and took T.B. to J.C.'s room. When P.M. returned to the room, Pop was the only man in the room.

In J.C.'s bedroom, Mr. Pointer began to sexually assault T.B. During the assault, the defendant opened the bedroom door, and Mr. Pointer stopped his assault and pretended as though he was simply talking to T.B. The defendant immediately closed the bedroom door, and Mr. Pointer resumed his sexual assault. The defendant later opened the bedroom door a second time and caught Mr. Pointer in the midst of his assault. The defendant entered the bedroom and said to Mr. Pointer, "[W]hat are you doing, come on out of there" and exited the bedroom. Mr. Pointer then returned with T.B. to her bedroom.

Once the three men and the victims were back in T.B.'s room, T.B. heard the men telling a fourth party that they could not find anything and asking if they should leave the residence. J.C. heard the men say "'that the house was clean,'" and he observed them ripping the telephones out of the wall. Pop was speaking with an individual on a walkie-talkie, and this person told the men to exit the residence. J.C. testified that before the men left, they instructed the victims not to leave until the men were gone. The men made off with J.C.'s cell phone and several dollars off of his dresser, P.M.'s cell phone and $400 from her purse, and a cell phone belonging to T.B.

After the men left, the victims began to assist each other in removing the duct tape. T.B., whose hands had been freed when Mr. Pointer took her into J.C.'s bedroom, called the police. Several officers, including Detective Edmond Strickling, arrived at the scene. Detective Strickling testified that in 2009, he was working for the Metro Nashville Police Department in the sex crimes unit. He arrived at B.M.'s residence and interviewed P.M., T.B., and J.C. He interviewed the three separately, and each provided the same general description of the defendant as a African-American male who wore a black "hoodie", had dreadlocks "[p]ossibly down to his shoulders," and a tattoo of the letter "C" on his forearm. After the interview, P.M. and T.B. went to the hospital for a medical examination. Detective Strickling took DNA swabs from P.M. to the Tennessee Bureau of Investigation ("TBI") to put in the CODIS system for testing. However, he was not able to develop any other leads in the case, and the case "kind of went cold."

Nearly a year and a half after the robbery, on February 14, 2011, T.B. saw the defendant when both were being booked into jail. The defendant had already been booked, and T.B. was beginning the booking process. When T.B. saw the defendant, she immediately recognized him as one of the men who broke into her house. His tattoos were not visible, but she was able to recognize him based solely upon his facial features. When the defendant saw her, he "did a double take," and he approached T.B. to speak

4

with her. He asked T.B. to make a phone call for him, and T.B. told him that she could not use the phone. The defendant continued to try to speak to her, and eventually a guard locked the defendant in a separate cell.

T.B. estimated that she was with the defendant for an hour in jail. When she left, the defendant handed her a slip of paper with "a lot" of names and telephone numbers. He asked her to call the numbers to help him get out of jail "before his probation violation c[a]me up in the system." T.B. told her mother that she saw the defendant in jail, but she did not contact Detective Strickling because she did not know how to reach him.

In April of 2011, Detective Strickling learned that there had been a CODIS match from the DNA swab of P.M. that identified Mr. Pointer. Detective Strickling subsequently contacted P.M. and T.B. and met with them to show them a photograph lineup that included Mr. Pointer. Each victim viewed the lineup separately. Before showing them the lineup, Detective Strickling explained "that the suspect may or may not be in this form, in these photos, don't assume that the guilty party is in the photos, the photo lineup is used in a way to also free up and prove someone's innocence as long as – as well as guilt." T.B. corroborated these cautionary instructions, testifying that Detective Strickland told her prior to showing her the lineup that "it's a page of people, they may or may not have committed this crime, it may just be that they're eliminating someone off of here." Both T.B. and P.M. identified Mr. Pointer from the lineup.

After viewing the lineup, T.B. informed Detective Strickling that she may have seen the suspect with a "C" tattooed on his arm while she was in jail. T.B. had attempted to locate a "Face It" magazine, which contained the mug shots of people who had been arrested, to find the defendant's mug shot, but she was unable to do so. She was unable to provide Detective Strickling with the piece of paper containing the names and numbers that the defendant had given her because she had lost it. However, the defendant had given T.B. his phone number, and Detective Strickling testified that T.B. was able to provide him with that phone number. Detective Strickling retrieved the records for all of the African-American males arrested on the same day as T.B. By cross-referencing the phone number provided by T.B. with the arrest records of February 14, 2011, Detective Strickling was able to discover that the defendant gave that phone number when he was booked. Detective Strickling looked through the historical photos of the defendant and saw that he had a tattoo of the letter "C" on his forearm. He agreed that the photograph of the defendant matched the description given to him by the victims.

After finding the photograph of the defendant, Detective Strickling interviewed Mr. Pointer about the crime. He showed Mr. Pointer a lineup that contained the defendant's photograph, and Mr. Pointer picked the defendant's photograph out of the

lineup. Mr. Pointer voluntarily provided information about the defendant, using the defendant's first name. He described the defendant as a black male with dreadlocks, and he told Detective Strickling where the defendant lived and the type of vehicle that he drove.

After speaking with Mr. Pointer, Detective Strickling compiled a photographic lineup that contained the defendant's picture. He testified that he did not tell the victims that the man T.B. had seen in booking was in the lineup or that any of the persons in the lineup had a tattoo of the letter "C." He stated that he read the victims the "advisory for reviewing a photograph form" and explained to the victims that "the guilty party may or may not be in here, and the purpose of the photo lineup is to free up the innocent as well as [implicate] the guilty." T.B. and J.C. confirmed that Detective Strickling gave them cautionary instructions before showing them the lineup. T.B., J.C., and P.M. each viewed the lineup separately. T.B., J.C., and Detective Strickling all testified that Detective Strickling did not direct their attention to a particular photograph. T.B. picked out the defendant's photograph almost immediately after seeing the lineup, and she told Detective Strickland that she was "[o]ne hundred percent sure" of her identification. J.C. also selected the defendant's photograph, and he believed that he was "75 to 80 percent" confident in his identification.

Kirk Pointer testified that he pled guilty to aggravated rape, aggravated sexual battery, two counts of aggravated robbery, and aggravated burglary stemming from the incident at the victims' home. He stated that he was friends with the defendant and Pop and had known them for about six months prior to the incident. The men met at Mr. Pointer's aunt's house to discuss the crime. He knew the defendant as "Rod" and the third man as "Pop." Mr. Pointer recalled that the defendant had dreadlocks and tattoos on his arms. When asked whose idea it was to commit the robbery, Mr. Pointer testified, "I think it was -- I think it was they idea." He believed that the house was selected because it contained drugs. He did not have any knowledge that drugs were in the house, and he received this information from the defendant and Pop. He agreed that the District Attorney did not threaten him or coerce him into pleading guilty and that he did not receive any promises in exchange for his guilty plea. He agreed that the District Attorney did not ask him to testify at trial in exchange for a plea deal.

On cross-examination, Mr. Pointer testified that he had "a lot" of prior felonies. He agreed that he was facing a potential sentence of life without parole as a result of the "three strikes rule." He agreed that he was initially charged with fourteen crimes and that nine were dismissed after he pled guilty to five. He testified that the defendant may have had a "C" tattooed on his arm but that he could not recall what was on the defendant's other arm. He testified that he did not attempt to help detectives find Pop because he did not know where to find him.

6

Mr. Pointer's attorney testified that he had thorough discussions with the District Attorney about a plea bargain for Mr. Pointer. He agreed that the discussions did not involve the possibility of Mr. Pointer testifying against any of his co-defendants in the case.

Ellard Miller testified that he was the records technician at the Davidson County Sheriff's Office. He authenticated documents that showed that the defendant and T.B. would have been in the booking area at the same time.

Dr. Jeffrey Neuschatz testified as an expert in the field of eyewitness identification. He testified that a lengthy retention interval between an event and a later viewing of a lineup could be harmful in making an accurate eyewitness identification and could potentially lead to a mistaken identification. He testified that it was possible that T.B. could have mistakenly incorporated her encounter with the defendant in jail into her memory of the robbery. He stated that as a result, T.B. could have been mistaken in her later identification of the defendant.

Dr. Neuschatz testified that a high-stress situation decreases a person's ability to make an accurate identification. He discussed "weapon focus," which is a theory that if a weapon is present, a person is more likely to be looking at the weapon instead of focusing on the other aspects of the event. He testified that weapon focus "inhibits people's ability to make accurate identifications."

Dr. Neuschatz explained that confidence in an identification did not always correlate to accuracy in the identification. He testified that confidence was affected by a variety of factors that were unrelated to the accuracy of an identification or the memory of a particular event. He also testified that covering a person's hairline impaired the accuracy of an eyewitness identification. He agreed that if a person's face were covered with a bandana, it could affect another person's ability to accurately remember the event and make an identification. He testified that it was more difficult to identify a person whose face was covered than a person whose face was fully visible.

Dr. Neuschatz testified that several guidelines for conducting an unbiased lineup were followed in this case but that several were not followed, particularly the lack of a "double blind" lineup. He testified that the lineup was not a double blind lineup because Detective Strickling knew the identity of the suspect. He explained that the guidelines for unbiased lineups were promulgated by the Department of Justice, but he agreed that the Department of Justice had not recommended a double blind lineup when the lineup guidelines were published in 1999. He agreed that the combined effect of a high-stress

situation, the presence of weapons, and the covering of faces could have led to a mistaken identification in this case.

At the conclusion of the proof, the jury found the defendant guilty of all charges.

At the sentencing hearing, the State agreed that the defendant was a Range I offender. The State gave a victim impact statement on behalf of the victims. The statement said that both P.M. and T.B. were still suffering as a result of the defendant's crimes. Both P.M. and T.B. were receiving counseling as a result of the robbery, and the victims wished for the court to impose the maximum sentence possible.

The defendant took the stand to read a letter "explaining that [he was] sorry about what happened." He stated that he was sorry for "the situation" that the victims experienced on the evening of the incident. He apologized for forcing the victims to re-live the incident by testifying at trial. The defendant claimed that he was "just . . . stressed trying to get back to [his] family." He stated that he "made a mistake" and wished that he "could make a change for his mistake." When asked why he wanted to apologize, the defendant responded, "Wrong place at the wrong time." He testified that he was asking the trial court to "have mercy" on him and to give him "a chance to get back to his family."

The trial court allowed the State to cross-examine the defendant. When asked if he admitted that he committed the crime, the defendant said, "No, I didn't commit a crime." He stated that he did not commit the crimes for which he was convicted and that he did not know Mr. Pointer or Pop prior to the incident. He testified that he wanted to apologize because "[i]f I'm being accused of a crime, at least I want to apologize for what's going on." He agreed that he wished to apologize for the fact that he was accused of a crime but maintained that he did not commit the crime. He admitted that he was on probation for several felony convictions in Georgia the night that the incident occurred.

The trial court stated that it considered the evidence presented at trial and at the sentencing hearing, the presentence report, the sentencing principles embodied in Tennessee Code Annotated section 40-35-103, the arguments made as to the length of the sentence that should be imposed, the nature and characteristics of the criminal conduct involved, the evidence and information offered on enhancing and mitigating factors, the testimony of the defendant on his own behalf at the sentencing hearing, the defendant's potential for rehabilitation or treatment, as well as the general purposes for which the Sentencing Reform Act was enacted.

The trial court found that the defendant was a violent Range I offender for the aggravated kidnapping convictions and a standard Range I offender for the remaining convictions. The court found that enhancement factor one, the defendant's prior criminal history, applied because the defendant had prior felony convictions from Georgia,

numerous misdemeanor convictions from Davidson County, and several crimes that he committed before he was arrested on the instant charges. The court found that enhancement factor two, that the defendant was the leader in the commission of an offense, applied to the robberies because Mr. Pointer appeared to be focused on sexually assaulting the victims while the defendant "took the lead role" in robbing the victims. The court applied enhancement factor eight, that the defendant failed to comply with conditions of a sentence involving release into the community, because the defendant was on probation for his felony convictions in Georgia when he committed the instant crimes. The court found that enhancement factor nine, the employment of a firearm during the commission of a dangerous offense, applied to the aggravated burglary. For the aggravated burglary, the court also found that the defendant had no hesitation about committing a crime where the risk to human life was high, as the defendant broke into the home, saw B.M. in the living room, and proceeded to commit the other offenses instead of leaving the premises. The court also found that enhancement factor thirteen, that the defendant was on probation at the time of the offenses, applied because he was on probation from Georgia. The court found that no mitigating factors were applicable.

The trial court found that the offenses committed by the defendant were severe offenses and that he possessed a criminal history "evincing a clear disregard for the laws and morals of society." The court noted that the defendant "routinely became a fixture within the criminal justice system," once he became an adult. The court found that past efforts at rehabilitation for the defendant had failed, reiterating that the defendant was on probation when he committed the instant offenses. The court found that confinement was the least severe measure necessary to achieve the purpose for which the sentence was imposed. The court found that confinement was necessary to avoid depreciating the seriousness of the offenses and to protect society, noting that "home invasions [were] extremely serious." The court found that confinement was also necessary to protect society by incarcerating a defendant with a lengthy history of criminal conduct and a propensity to continue to engage in criminal activities. The court observed that the majority of the defendant's convictions were for non-violent crimes but that his criminal conduct was continually ongoing The court found that less restrictive measures of punishment had previously been applied to the defendant without success.

The trial court sentenced the defendant to six years for the aggravated burglary conviction, four years[3] for the possession of a firearm with the intent to go armed during the commission of a dangerous felony conviction, twelve years for each of the aggravated kidnapping convictions, twelve years for the aggravated robbery convictions, and six

---

[3] At the sentencing hearing, the trial court stated that it was imposing a six-year sentence for the possession of a weapon during the commission of a dangerous felony. However, the judgment reflects that the court imposed a four-year sentence with a mandatory minimum length of three years. *See* T.C.A. § 39-17-1324(g)(1) (2010).

years for the aggravated assault conviction. The trial court ordered the firearm sentence to be served consecutively to the sentence for aggravated burglary. The court ordered the kidnapping sentences to be served concurrently with each other but consecutively to the firearm sentence. The court ordered the aggravated robbery sentences and aggravated assault sentences to be served concurrently with each other but consecutively to the kidnapping sentences. The effective length of the sentence was thirty-four years.[4]

The court found that there was a substantial basis to justify consecutive sentencing because the defendant had a record of criminal activity and because he was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime when the risk to human life was high. The court found that the circumstances surrounding the offenses were aggravated. The court found that even if the defendant was not a direct participant in the sexual assaults, he knew that they were occurring and did nothing to stop them. The court found that an extensive period of confinement was necessary to protect society from the defendant's unwillingness to lead a productive life and that he resorted to criminal activity to further his anti-societal lifestyle. The court found that the aggregate length of the sentence was reasonably related to the offenses for which the defendant was convicted.

The defendant filed an untimely motion for new trial. The certificate of service on the motion stated that the motion was filed on December 14, 2012, which would have been within the thirty-day time period required by Tennessee Rule of Criminal Procedure 33(b). However, the motion was not actually filed until January 22, 2013. On February 21, 2013, the petitioner filed a "Motion to Dismiss Trial Counsel on the Grounds of Ineffective Assistance of Counsel and Conflict of Interest." New counsel was subsequently appointed and filed an amended motion for new trial on September 11, 2013. The trial court held a hearing, after which it denied the motion. It appears that neither the court, the State, nor the defendant was aware that the initial motion for new trial was untimely filed. New counsel filed a notice of appeal and discovered during the briefing process that the initial motion was untimely. Counsel filed a motion to voluntarily withdraw the appeal, which this court granted. Counsel subsequently filed a petition for post-conviction relief seeking a delayed appeal on the grounds that trial counsel was ineffective for failing to timely file the motion for new trial. The trial court granted the motion and granted the defendant a delayed motion for new trial and direct appeal. New counsel timely filed a delayed motion for new trial, and the trial court denied the motion. The defendant has appealed this denial, and we proceed to consider his claims.

---

[4] At the sentencing hearing, the trial court stated that the aggregate length of the sentence was thirty-six years.

# ANALYSIS

## I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain his convictions for aggravated kidnapping. He contends that the confinement that constituted the aggravated kidnapping was incidental to the actions that constituted the rape and robbery of the victims.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

In *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012), our supreme court overruled the line of cases that required a separate due process analysis to analyze the sufficiency of the evidence of a kidnapping conviction and an accompanying felony. The court held that the inquiry of whether the removal or confinement of the victim was essentially incidental to the accompanying felony "is a question for the jury after appropriate instructions, which appellate courts review under a sufficiency of the evidence standard as the due process safeguard." *Id.* at 562. The court reasoned that "[t]he jury, whose primary obligation is to ensure that a criminal defendant has been afforded due process, must evaluate the proof offered at trial and determine whether the State has met its burden." *Id.* at 577. The court opined that an appellate court's role in evaluating the

11

sufficiency of the evidence "qualifies as the ultimate component of this constitutional safeguard." *Id.* at 578.

The court promulgated a set of jury instructions to "ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* In order for the jury to determine whether the elements of aggravated kidnapping were established beyond a reasonable doubt, there must be "a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.*

The defendant does not contend that the trial court failed to provide the jury with the *White* instructions. Therefore, we review the issue to determine if the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the confinement was not essentially incidental to the aggravated robbery.

Aggravated kidnapping is defined as the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" that is committed "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-302, -304(a)(5) (2010).

Aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or by putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-401(a), -402(a)(1).

Viewing the evidence in the light most favorable to the State, the proof shows that the defendant and two other men kicked in the door of B.M.'s home and entered the residence carrying guns. T.B. and P.M. entered the living room, where Mr. Pointer was aiming a gun at B.M.'s head. Rather than restraining the family in the living room, the men took T.B., P.M., and B.M. into T.B.'s room at gunpoint, and the defendant took J.C. at gunpoint from his bedroom and into T.B.'s bedroom. In the bedroom, T.B., P.M., and J.C. were forced to lie on their stomachs on the bed while their hands, feet, and mouths were bound with duct tape. Once the victims were bound, the defendant then ransacked the house, and his gun was visible for the duration of the incident, which lasted about thirty minutes. After taking the victims' cell phones and money from P.M.'s purse, the defendant continued to search the house while the victims were restrained and held at gunpoint. Before exiting the residence, the defendant and the others ripped the telephones out of the wall and instructed the victims not to leave until the men were gone. Once the men were gone, the victims were able to free themselves from the duct tape and call the police. We conclude that the evidence was sufficient to show that the removal and confinement of the victims exceeded that necessary to effectuate the aggravated robbery. The defendant is not entitled to any relief.

## II. Motion to Suppress

The defendant argues that the trial court erred in denying his motion to suppress the photographic lineup. Specifically, he contends that the identification procedure was unduly suggestive and that the totality of the circumstances weighs against a finding that the identifications were reliable.

At the motion to suppress hearing, T.B., J.C., and Detective Strickling testified. T.B. and J.C. provided the same description of the incident and physical description of the defendant as they did at trial. J.C. estimated that although he saw the defendant for only thirty seconds in the living room, the entire incident lasted for twenty-five to thirty minutes, and he was able to see the defendant for a total of twenty or twenty-five minutes. T.B. testified that the lights were on in the home during the robbery and that she felt as though she was able to get a good look at the defendant's visible features. She testified that before she viewed the photographic lineup with the defendant's photograph, Detective Strickling told her that "the person can or cannot be on the paper, but just look at it and see if [she] can -- if he looks like the guy." She stated that Detective Strickling did not direct her attention to a particular photograph, and she did not recall that there was anything unusual about the photographs. She did not recall one of the photographs in the lineup being larger than the others. She immediately selected the defendant's photograph, and she felt "a hundred percent" certain in her identification. She testified that Detective Strickling did not show her the defendant's tattoo and that she did not know whether any of the individuals in the photograph lineup had a tattoo.

J.C. testified that he was shown a photographic lineup in the kitchen of his home. He stated that he was alone in the kitchen when he viewed the lineup. He testified that a detective told him that "he was going to show [J.C.] a picture of guys and the guy that he might not be on there, but he told [J.C.] stop and try [his] hardest to see if [he] can find the guy." He stated that he was never told that one of the individuals had tattoos and that his attention was not directed to a particular suspect in the lineup. J.C. testified that there was nothing particular about the lineup that caused him to identify a photograph. He testified that all of the heads in the photographs in the lineup were the same size and taken from the same angle. He was able to identify the defendant from the lineup, and he felt "75, 80" percent sure of his identification. Detective Andrew Strickland[5] testified that he interviewed T.B., P.M., and J.C. at the scene of the crime. He stated that all three victims gave the same general description of the suspects. The defendant was described

---

[5] At the suppression hearing, the record indicates that the detective's name was "Andrew Strickland," but the trial transcript indicates that he gave his name as "Edmond Strickling." Despite the discrepancy, it appears that the individual who testified at the suppression hearing was the same individual who testified at trial.

as wearing a hoodie over his head, having dreadlocks, and a tattoo of the cursive letter "C" on his forearm. The victims described the defendant as "medium height." He testified that a patrol officer would have included the description in the patrol report and that the description in the report stated that the defendant was "[f]ive-eight, 170 pounds, black hair, brown eyes." Detective Strickland agreed that the description included that the defendant had dreadlocks and the tattoo of the letter "C." He agreed that the description was similar to that of the defendant.

Detective Strickland testified that he received a CODIS hit on the DNA recovered from P.M. that identified Mr. Pointer as a suspect. He met with T.B. and P.M. to show them a lineup, and at this meeting T.B. informed him that she had seen the defendant in jail. He identified the date that she was arrested and cross-referenced it with every male that was arrested that day. He identified the defendant and found that he matched the description given by the victims. When he later interviewed Mr. Pointer, he brought a photograph of the defendant. Mr. Pointer identified the defendant from the photograph and stated that his name was "Rod." Detective Strickland compiled a photograph lineup containing the defendant's photograph and showed it to the three victims. He testified that the photographs in the lineup were in black and white. At the time that he compiled the lineup, the police department was in the process of activating a new operating system. As a result of the change, Detective Strickland either did not have access to all of the photographs previously in the database, or they had been deleted. Law enforcement were learning how to input driver's license photographs and jail photographs into the same lineups, and some of the driver's license and jail photographs had different backgrounds. In order to avoid drawing attention to the color photographs, Detective Strickland made all of the photographs black and white. He stated that he attempted to include photographs of individuals that matched the defendant's description. He testified that he showed the lineup to each of the victims separately.

Detective Strickland testified that he read the victims the photograph identification form. He explained to the victims that "they're going to be looking at photos that the guilty person may or may not be in here[;] it could also be used to eliminate suspects if there are any suspects." He testified that he did not tell T.B. prior to the lineup that he had discovered the person she saw in booking or that the person had a tattoo of the letter "C." He did not tell any of the victims that he had identified the person T.B. saw in booking or that he matched the description of one of their assailants. He testified that both T.B. and J.C. selected the defendant's photograph. He stated that T.B. was "[a] hundred percent" confident in her identification and that J.C. was eighty percent confident.

On cross-examination, Detective Strickland testified that he was not provided with a description of the color of the defendant's tattoo. He agreed that there was a photograph of the tattoo in the police database. He testified that the heads of the

14

individuals in the defendant's photograph lineup were all the same size.  The court examined the lineup and observed that in photographs three and four, "the heads seem to be a little bit closer because the upper body is not showing[.]"  Photograph four was the defendant's photograph.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them.  *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001).  The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.  *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).  However, the application of the law to the facts is a question of law that this court reviews *de novo.  State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).  "Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court."  *State v. Cribbs,* 967 S.W.2d 773, 795 (Tenn.1998).

A conviction challenged on the grounds of an improper photograph lineup "will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972), the United States Supreme Court promulgated a two-part analysis to determine whether a pretrial photograph identification procedure violated a defendant's due process rights.  First, the court must consider whether the lineup was unnecessarily suggestive. *Id.* at 198.  Second, if the court finds that the lineup was suggestive, it must consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

In examining the totality of the circumstances, courts should consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  *Biggers*, 409 U.S. at 199-200.  It is not necessary to consider the totality of the circumstances if the trial court finds that the identification procedure was not unnecessarily suggestive.  *State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

We have examined the lineups shown to T.B., P.M., and J.C.  The array includes six photographs of younger African-American males, all of whom have dreadlocks that are similar in length.  The photographs are generally similar in size, although the heads of the suspects in two photographs, including the one of the defendant, appear closer to the camera because the upper bodies of the suspects are not visible.  However, this size

15

difference is not pronounced. Additionally, one of the photographs, not containing the defendant, is visibly darker than the other five. The differences in the photographs are slight, and we conclude that the photographs were not so "grossly dissimilar" as to render the lineup unnecessarily suggestive. *See State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993).

However, even if the lineup were unnecessarily suggestive, the totality of the circumstances indicates that the identification was reliable. Both T.B. and J.C. testified that they each were able to see the defendant for about fifteen or twenty minutes during the incident and that the defendant was in close proximity to them while the victims were in T.B.'s bedroom. The defendant's bandana slipped off of his face several times during the incident, and the victims testified that they were able to see the majority of his face. Both victims testified that they focused on the defendant's physical features in hopes of later identifying him. Both victims described the defendant as being slightly taller than 5'7", with a medium physical build and shoulder length dreadlocks, and this physical description matched that of the defendant. The victims also identified a tattoo of the letter "C" on the defendant's arm, and Detective Strickling testified that the defendant had such a tattoo. Although the victims first viewed the lineup over a year and a half after the crime, T.B. immediately identified the defendant and stated that she was one hundred percent certain in her identification. J.C. also identified the defendant in the lineup and testified that he was seventy-five to eighty percent confident in his identification. T.B., J.C., and Detective Strickling all testified that Detective Strickling did not direct their attention to a particular photograph and that nothing other than a recognition of the defendant caused them to select the photograph of the defendant. Based on the totality of the circumstances, we conclude that the photograph lineup was sufficiently reliable, and the defendant is not entitled to any relief.

### III. Sentencing

The defendant argues that the trial court erred in imposing his sentence. Specifically, he contends that the trial court misapplied an enhancement factor and that consecutive sentencing was not the least severe measure necessary to accomplish the purpose for imposing the sentence.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The misapplication of an enhancement or

16

mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.*

After the trial court establishes the appropriate range of the sentence, the court must consider the following factors to determine the specific length of the sentence: (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in his own behalf about sentencing. T.C.A. § 40-35-210(a), (b)(1)-(7).

The defendant argues that the trial court should not have applied enhancement factor two. The record reflects that the defendant informed the other men that they were in the correct house after he identified T.B.'s sister's boyfriend in a photograph. The victims testified that the defendant was continually asking where the money was, that he was the individual who was primarily responsible for searching the house, and that he emptied the contents of P.M.'s purse onto the ground. As the trial court found, Mr. Pointer's primary objective appeared to be the sexual assault of the victims while the defendant appeared to take the lead role in the robbery. Further, we note that this enhancement factor "does not require that the defendant be the sole leader but rather that he be 'a leader,' and as a result both of two criminal actors may qualify for enhancement under this factor." *State v. Freeman*, 943 S.W.2d 25, 30-31 (Tenn. Crim. App. 1996) (citing *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The record supports the finding that the defendant was a leader of a criminal offense involving two or more criminal actors, and he is not entitled to any relief.

The defendant also argues that the trial court erred in imposing consecutive sentences. He contends that his effective sentence of thirty-four years was not the least severe measure necessary to achieve the purposes of the imposed sentence.

A trial court's decision to impose consecutive sentencing is reviewed under an abuse of discretion standard accompanied by a presumption of reasonableness, so long as the trial court states for the record that the defendant falls into one of seven categories enumerated in Tennessee Code Annotated section 40-35-115(b). *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A court may impose consecutive sentences if it finds that

the defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). In order to impose consecutive sentences on this basis, the trial court must also "conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862.

The trial court found that the defendant was a dangerous offender and appropriately considered the *Wilkerson* factors. The court noted that home invasions were "extremely serious" and found that confinement was necessary to avoid depreciating the seriousness of the defendant's crime. The trial court also found that confinement was necessary to protect the public, citing to the defendant's prior criminal history and propensity to continue his criminal activities. The court additionally observed that less restrictive measures had previously been applied to the defendant without success. The record supports the findings of the trial court, and we conclude that the trial court properly imposed consecutive sentences.

Although the trial court properly considered the enhancement factors and imposed consecutive sentencing, we note that there is a discrepancy between the sentencing hearing and the judgment of conviction for Count 9, possession of a firearm with the intent to go armed during the commission of a dangerous felony. At the sentencing hearing, the trial court stated that it was imposing a six-year sentence for the conviction. The judgment of conviction reflects that the defendant received a four-year sentence. In order to clarify this discrepancy, we remand the case for resentencing as to Count 9. We also note that the judgment erroneously lists the code provision for the conviction offense as Tennessee Code Annotated section 39-17-1417 instead of 39-17-1324. Therefore, we also remand the case for the entry of a corrected judgment reflecting the proper code section for the conviction offense.

## CONCLUSION

Based upon the foregoing, we affirm the judgments of the trial court and remand the case for resentencing as to Count 9.

_____
JOHN EVERETT WILLIAMS, JUDGE

18